PEOPLE v FRANK WILLIAMS

1. WITNESSES—RELIGIOUS BELIEFS.
   No witness may be questioned in relation to his opinion on religion or a Supreme Being either before or after he is sworn (MCLA 600.1436).

2. CRIMINAL LAW—WITNESSES—IMPERMISSIBLE QUESTION.
   A prosecutor may not ask a witness whether he would tell a falsehood in order to save the defendant.

3. EVIDENCE—ARMED ROBBERY—PROBATIVE VALUE—WEAPON.
   The introduction into evidence of a gun found at the scene of an armed robbery was not prejudicial error even though the gun was not linked to the defendant and even though the probative value was so minimal that the trial judge could have excluded its introduction.

REFERENCES FOR POINTS IN HEADNOTES
[1] 58 Am Jur, Witnesses § 126 et seq.
  Religious belief or lack of it as affecting credibility of witness, 95 ALR 723.
[2] 58 Am Jur, Witnesses § 553 et seq.
[3] 46 Am Jur, Robbery § 50 et seq.

Appeal from Recorder's Court of Detroit, Henry L. Heading, J. Submitted Division 1 December 10, 1971, at Detroit. (Docket No. 11989.) Decided March 24, 1972.

Frank Williams was convicted of armed robbery. Defendant appeals. Reversed and remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Thomas M. Khalil,* Assistant Prosecuting Attorney, for the people.

*Arthur J. Tarnow,* State Appellate Defender, and *Jane Burgess,* Assistant Defender, for defendant.

Before: Lesinski, C. J., and Levin and O'Hara,* JJ.

Levin, J. The defendant, Frank Williams, appeals his conviction of attempted armed robbery. MCLA 750.92, 750.529; MSA 28.287, 28.797.

During the cross-examination of two of the defendant's witnesses the prosecutor asked whether they believed in the Supreme Being and whether they would tell a falsehood to save the defendant. This line of questioning was manifestly improper and should not have been permitted.

The following is the relevant portion of the cross-examination of defendant's half-brother, Albert Rhymes:

"*Q.* All right. Now, do you believe in the Supreme Being?
"*A.* God? Yes.

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

"*Q.* Okay. You know the significance of taking an oath?

"*A.* Yes, I do.

"*Q.* You swore to tell the truth?

"*A.* (No response.)

"*Q.* Would you tell a falsehood to save your half-brother, Frank?

"*Mr. Jaffe* [*defense counsel*]: Your Honor, I think that's an improper characterization to ask this witness to characterize his own testimony. I think as far as the question and answer, that's for the jury to accept what he says or not, but to ask him questions which go to his beliefs and whether or not you are sure you are telling the truth. I think that's an improper characterization.

"*Mr. Douglas* [*assistant prosecutor*]: I asked whether he believed in the Supreme Being. He answered positive. I asked him would he tell a falsehood to save a half-brother, and I think it's a legitimate question. I think he can answer 'Yes' or 'No'.

"*The Court:* I think it's a fair question and I'll allow him to take the answer.

"*Q.* (*By Mr. Douglas, continuing*): Now, would you tell us a falsehood to save your half-brother?

"*Mr. Jaffe:* I object, your Honor. I don't—

"*The Court:* Your objection is noted, Mr. Jaffe.

"*The witness:* Would I tell a falsehood to save my brother?

"*Mr. Douglas:* I can't hear you, sir.

"*The witness:* I guess in some cases, maybe I would and maybe I wouldn't. I don't know.

"*Q.* (*By Mr. Douglas, continuing*): You would or you wouldn't? Speak up now, so the jury can hear you, please.

"*A.* Well, yes and no.

"*Mr. Douglas:* Okay. No further questions.

"*Mr. Jaffe:* I have no questions, your Honor."

Later the prosecutor pursued this line of ques-

tioning with witness Orlando Johnson, the defendant's brother-in-law:

"*Q*. Okay. Now, do you believe in the Supreme Being?

"*A*. Sir?

"*Q*. Do you believe in the Supreme Being?

"*A*. Do I believe in the Supreme Being?

"*Q*. Yes, sir. You raised your right hand and swore to tell the truth, and I am asking you if you if you do believe in the Supreme Being?

"*A*. I don't understand the question.

"*Q*. Well, do you believe in some kind of spiritual being or God or anything like this?

"*A*. Yes.

"*Q*. And you know what it is to tell the truth and take an oath, right?

"*A*. Yes.

"*Q*. Now, in this particular case I want to ask you if you would tell a falsehood to save Frank Williams?

"*Mr. Jaffe:* At this time, your Honor, I realize that you ruled on the other occasion and I would like to pose an objection.

"*The Court:* Your objection is noted and the same ruling would be overruled and he may make an answer.

"*Q*. (*By Mr. Douglas, continuing*): May we have an answer, sir?

"*A*. What's that?

"*Q*. I asked in this particular case you [*sic*] would you tell a falsehood to save Frank Williams?

"*A*. No.

"*Mr. Douglas:* Okay. No further questions.

"*The Court:* You may step down."

The statute, rooted in the Constitution (Const 1963, art 1, § 18), is explicit in prohibiting any questioning of a witness concerning his opinions on the subject of religion:

"No person may be deemed incompetent as a witness, in any court, matter or proceeding, on account of his opinions on the subject of religion. No witness may be questioned in relation to his opinions on religion, either before or after he is sworn." MCLA 600.1436; MSA 27A.1436.[1]

It was, therefore, improper to ask the witnesses whether they believe in a Supreme Being.

Nor should the judge have compelled an answer to the prosecutor's hypothetical question: "Would you tell a falsehood to save your half-brother?" The question, as witness Rhymes' responses indicated, conjured up the possibility of circumstances even more imperative than the pending charge then being tried. The pertinent inquiry was whether the witness was lying or telling the truth during his testimony in chief, not what he might do in all events and circumstances.[2]

The question asking whether the witness would tell a falsehood to save the defendant is a no-lose question for the prosecutor. If the witness denies that he would tell a falsehood, some jurors will conclude that he is lacking in fraternal loyalty while others will conclude that he is not being candid. If, on the other hand, the witness admits that he might conceivably—depending on the circumstances—tell an untruth, his testimony in chief is discredited. The prosecutor's question damns the witness if he does, and damns him if he doesn't.

A prosecutor is, of course, entirely justified in bringing out during cross-examination a relationship between the witness and the defendant. He may not, however, argue that relationship, directly or indi-

---

[1] This statutory provision goes back to 1842 PA 18 (see also 1846 RS, ch 102, § 96). There has been no substantive change in the language since the first enactment of this provision.

[2] *Cf.* 3 Wharton, Criminal Evidence (12th ed.), § 867, p 260.

rectly, with the witness.[3]  The time for argument is during jury addresses.  At that time the prosecutor may properly ask the jurors to consider any relationship between the witness and the defendant in deciding on the witness's credibility.

There was, contrary to another of the defendant's contentions, sufficient evidence of the defendant's guilt to justify the trial judge in submitting the case to the jury for its consideration.  A number of eyewitnesses testified that the defendant participated in the commission of the armed robbery.

The contention that the verdict was against the great weight of the evidence cannot be considered because we review such a claim to determine whether the judge abused his discretion in denying a motion for a new trial made on that ground and in this case the motion for a new trial did not specify that ground;[4] accordingly, there is nothing before us to review.  *People* v *Mattison,* 26 Mich App 453, 459–460 (1970).

The evidence of the handgun found at the scene of the crime tended to corroborate other evidence and, therefore, was of some, albeit limited, probative value even though it was not linked to the defendant. Indisputably guns were used during the robbery. Indeed, the defendant was shot during the robbery. The disputed factual issue was whether the defendant was one of the robbers or a customer.  The gun was of such minimal probative value that the judge could have exercised his discretion to exclude it. Viewed in context, however, the defendant could not

---

[3] *Cf. Bassett* v *State,* 190 Ind 213; 130 NE 118 (1921); *People* v *Cahoon,* 88 Mich 456, 461–462 (1891); *Knotts* v *State,* 16 Ala App 442; 78 So 640 (1918); *Frankel* v *Wolf,* 7 Misc 190; 27 NYS 328 (NY Com Pl, 1894).

[4] The defendant's motion for a new trial asserted that the jury's verdict "was not supported by the evidence".

have been prejudiced by the introduction of a gun found at the scene of the crime.

A majority of the Court is of the opinion that the claim of error based on the nonproduction of indorsed witnesses was not saved for review.

For the error committed in the defendant's trial, we reverse and remand for a new trial.

All concurred.